## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| G.I. JOE'S HOLDING CORPORATION, *et al.*,) | | Case No. 09-10713(KG) |
| | ) | (Jointly Administered) |
|        Debtors. | ) | **Re Dkt No. 208** |
| WORLDWIDE DISTRIBUTORS, a | ) | |
| Washington cooperative association, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|   v. | ) | Adv. Pro. No. 09-50888(KG) |
| | ) | |
| WELLS FARGO RETAIL FINANCE, | ) | |
| LLC, Individually, and in its Capacity as | ) | |
| Agent for the Pre-Petition Senior Lenders, | ) | |
| CRYSTAL CAPITAL FUND | ) | |
| MANAGEMENT, L.P., Individually, and in | ) | |
| its Capacity as Agent for the Term Loan B | ) | |
| Lenders; G.I. Joe's HOLDING | ) | |
| CORPORATION, a Delaware corporation, | ) | |
| G.I. Joe's, Inc., an Oregon corporation, | ) | |
| | ) | |
|     Defendants. | ) | **Re Dkt. Nos. 40, 45 & 61** |
| _____ | ) | |

## <u>MEMORANDUM OPINION</u>[1]

## I. <u>INTRODUCTION</u>

The Court has been asked to decide issues which will determine the competing

interests of secured creditors. Worldwide Distributors ("Worldwide") brought this adversary

---

[1] This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

proceeding on April 7, 2009, to establish that it has a perfected first priority security interest in Debtors' assets — priority over the claimed security interests of defendants Wells Fargo Retain Finance, L.L.C. and Crystal Capital Management Fund, L.P. ("Crystal" and, collectively, "Lenders"). The issue is not of mere academic interest. Crystal loaned Debtors $35 million, secured by Debtors' assets. Worldwide asserts a claim of $5,709,657.00 for to pay Class A claims and is seeking payment of its entire claim. Worldwide's recovery may correspondingly reduce the Lenders' recovery given Debtors' limited assets. The decision follows the conclusion of a two day evidentiary hearing.[2]

## II. <u>BACKGROUND</u>

The Debtors filed voluntary petitions invoking the protections of chapter 11 of the Bankruptcy Code on March 4, 2009. The Court authorized the sale of Debtors' assets by Order, entered April 14, 2009. D.I. 208. The Sale Order provided that Worldwide would receive $1.3 million from the sale proceeds and Debtors were required to hold $6.7 million in escrow to be paid to Worldwide were it to prove it had a first secured lien. PreTrial Order[3] ("PTO"), ¶¶ III. 3a and b. D.I. 48. Worldwide also reserved the right to seek to recover any secured claim amount in excess of $8 million (*i.e.*, the $1.3 million paid to Worldwide and the $6.7 million held in escrow). As the Court will describe in greater detail, Worldwide claims its first creditor status because Worldwide made historical and written representations

---

[2] The Lenders also moved for summary judgment which the Court denies for the reasons explained below.

[3] Record references to the PreTrial Order indicate undisputed or uncontradicted facts.

to Debtors' vendors guaranteeing payment for Debtors' purchases and Worldwide holds a perfected security interest.

### III.  STATEMENT OF FACTS

### Worldwide's Business and Relation to Debtors

Worldwide is a business cooperative organized under the laws of the State of Washington that provides purchasing and warehousing services to its retailer members, including Debtors. PTO, ¶ III. 8.  The Worldwide members benefit from Worldwide's ability to make volume purchases which enables Worldwide to purchase products at lower prices and on better terms than the smaller individual retailer members.  The members thereby are able to obtain the advantages of larger retailers and can compete more effectively.  Trial Transcript ("Tr."), 58-59.

Worldwide was founded in 1947 and incorporated in 1955.  Debtors were members from Worldwide's inception and continuously had a representative serving on Worldwide's board.  PTO, ¶ III. 9.  In fact, Debtors were the cooperative's largest member.   Tr. 68.

Worldwide enables its members to buy goods from vendors through Worldwide or to buy goods directly from Worldwide.  Vendors deliver goods bought by members through Worldwide directly to the members, which is referred to as "drop-shipping."  Worldwide charges members a percentage fee for drop-ship sales, which it is refers to as an "upcharge."  The upcharge covers Worldwide's overhead and its risks of having to cover defaults by members.  PTO, ¶ III. 10.

3

Debtors' transactional and financial arrangement with Worldwide consisted of two general categories.

> (1) Debtors were permitted to purchase inventory from certain vendors (the "Class B Vendors") directly through Worldwide and make payments to Worldwide for payment to the Class B Vendors (the "Class B Claims"); and (2) Debtors were permitted to purchase inventory directly from certain vendors (the "Class A Vendors") and make payments directly to Class A Vendors for the purchases ("Class A Claims").

*See* WEX 31; PTO, ¶ III. 12.

Worldwide records Class B Claims as a balance sheet liability in its financial statements (PTO, ¶ III. 13); while it records Class A invoices which members have not paid as a contingent liability in a note to its financial statements.  PTO, ¶ III. 14.

Worldwide is obligated to pay vendors for drop-shipped goods. PTO, ¶ III. 10.  The guaranty arises from written and oral communications and Worldwide's historical practice of paying vendors for Class A invoices when a member does not or is not able to pay.  Tr. 88.

In addition to its custom and practice, before Debtors' bankruptcy Worldwide confirmed its guarantee to its vendors in writing.  In a letter, dated January 7, 2008 (WEX 41), Worldwide wrote:

> We guarantee payment on all purchases, regardless of whether they are a Class A or a Class B member, only if the invoice Bill To is addressed to Worldwide and the invoice is sent directly to Worldwide.

4

Worldwide is identified as the bill-to party for all members' drop-shipped goods, either because Worldwide is so identified on an invoice or because Worldwide receives a shadow copy of an electronic data interchange invoice ("EDI").  Tr. 147, PTO, ¶ III. 11. Debtors instructed the EDI processor to send the shadow copies to Worldwide.  Tr. 63, 221. In all drop-ship sales to Debtors, the vendor sent the invoice to Worldwide or Worldwide otherwise received the invoice as a shadow copy of an EDI invoice or through other means in the ordinary course of business.  Tr. 63.

Worldwide classifies drop-ship sales as Class A or B sales.  In both Class A and B sales, the vendor is expected to and in most cases does send the invoice to Worldwide, where Worldwide applies a numbered Worldwide sticker and records the sale.  Tr. 147.  In a Class A sale,  Worldwide then sends the invoice to the member, who is responsible in the first instance to make direct payment for the goods to the vendor on behalf of Worldwide.  In a Class B sale, Worldwide pays the vendor and then bills the member for reimbursement.  Tr. 68-69, PTO, ¶ III. 12.

Worldwide requires members to remit payment of invoices directly to Class A Vendors.  PTO, ¶ III. 15.  In the ordinary course of business, Worldwide does not require members to notify Worldwide of payments on Class A invoices, and Worldwide does not maintain a record of which Class A invoices have been paid and which remain unpaid.  *Id.* If a member does not timely pay a Class A invoice, the vendor requests that Worldwide pay the invoice, but Worldwide knows the full extent of its liability on unpaid Class A invoices

5

only from information vendors or members provide to Worldwide. *Id.* The procedures pertaining to Class A members are detailed in a "Member Handbook." WEX 43.

Worldwide began a process shortly after the petition date to ask vendors to quantify and address Worldwide's obligation to pay for Debtors' unpaid Class A invoices. Tr. 129. Worldwide also received limited information and documents from Debtors regarding unpaid Class A invoices. Worldwide identified and approved for payment unpaid Class A invoices totaling $5,709,657.00 as of June 14, 2009. Tr. 152, WEX 104. Through June 8, 2009, Worldwide paid $2,704,342.04 of that amount and has acknowledged its liability for the balance. WEX 107, Tr. 152-164. Worldwide is also reviewing the possible Class A status of additional unpaid vendor claims totaling $784,445.00. Tr. 163.

Debtors' liability for Class B invoices paid by Worldwide but not reimbursed by Debtors, plus additional charges, totals $1,803,618.15, with finance charges through April 30, 2009; additional finance charges accrue after April 30.[4] PTO, ¶ III. 23.

### Worldwide's Perfected Security Interest

Debtors and Worldwide have entered into at least four security agreements, the first in 1969 and the most recent on June 21, 2002 (the "2002 Security Agreement"). PTO, ¶ III. 25. Each security agreement encumbered all inventory and secured all indebtedness of Debtors to Worldwide.

---

[4] Lenders agreed at the time of the hearing to the $1.8 million claim for payments to the Class B Vendors.

The 1969 Security Agreement provides that (WEX 15):

> This Security Agreement is given to secure the payment and performance of all indebtedness and obligations of Debtor to Secured Party presently existing and hereafter arising, direct or indirect, and interest thereon.

The 2002 Security Agreement (WEX 20) provides Worldwide with an interest in all Debtors' assets (inventory, equipment, and a broad enumeration of other tangible and intangible property):

> . . . to secure the payment and performance of all of Debtors' obligations and indebtedness to Creditor, regardless of the form of such obligations and indebtedness arising at any time under this Agreement or otherwise. . . . .

In the 2002 Security Agreement, Debtors agreed to keep the collateral free of unpaid charges, liens, security interests, and encumbrances.  Debtors also agreed that its failure to perform any obligation under the 2002 Security Agreement and/or any other agreement with or in favor of Worldwide would constitute a default.  PTO, ¶ III. 25.

On June 15, 1978, Worldwide filed a UCC-1 financing statement with the Oregon Secretary of State.  The financing statement described inventory and proceeds and products of inventory.  Worldwide has continued that financing statement, and the current expiration date is April 1, 2013.  PTO, ¶ III. 27.

Other than Worldwide's financing statement, no unexpired Oregon financing statement naming Debtors as debtor predates March 5, 1998.  PTO, ¶ III. 28.

Lenders point to the following facts, all true:

1.      Worldwide recognized the Class B Claims (i.e., purchases from Worldwide) as a liability and they reported the losses in Worldwide's financial statements.  In contrast, the Class A Claims (i.e. purchases the Debtor paid or were supposed to pay directly to the Class A Vendors) were not reflected in Worldwide's balance sheets as a liability of Worldwide. PTO, ¶¶ III. 13, 14.

2.      None of the security agreements: (a) reference any Class A Vendors; (b) reference any obligation owed to Worldwide in connection with the Debtors' obligation to pay Class A Vendors directly; or (c) contain the signature of any entity purporting to represent the Class A Vendors.  WEX 15, 17, 18, 20; and prior security agreements.

3.      The 2002 Security Agreement does not contain the words "all direct and indirect indebtedness" but merely "to secure the Debtor's indebtedness to Creditor."  WEX 20.

4.      Worldwide did not enter into a written guaranty contract with any of the Class A Vendors nor did the Class A Vendors ever ask Worldwide to execute a written guaranty contract defining Worldwide's purported obligation to pay the Class A Vendors upon the Debtors' default.  PTO, ¶ IV. C. 5.

5.      Worldwide did not make any payments to Class A Vendors for purchases made by the Debtors, nor had any Class A Vendor made a demand for payment on the alleged guaranty prior to the Debtors' March 4, 2009 voluntary petitions.  PTO, ¶ IV. C. 6.

6.     Immediately prior to the petition date, the Debtor was indebted to Class A Vendors in an unknown amount.  Worldwide then asserted that as of May 27, 2009, the total balance due to Class A Vendors was $5,631,962.00.  The documents Debtors produced during discovery indicated that the total amount owed for Class A Claims, as of the petition date, was $4,840,421.46, PTO, ¶ III. 16.

7.     Worldwide later disclosed that as a result of its negotiations with the Class A Vendors, the amount allegedly owed by the Debtors to the Class A Vendors was reduced to $5,194,102.00, which Debtors later revised to $5,427,855.00.  PTO, ¶ III. 20.

8.     As of May 27, 2009, Worldwide had paid Class A Vendors $2,697,714.00 for purchases made by the Debtors.  PTO, ¶ III. 20.

9.     As of May 27, 2009, only nine (9), out of ninety-five (95), Class A Vendors had been paid in full.  PTO, ¶ III. 19.

## IV. **DISCUSSION**

On the first day of this case, Worldwide brought to the Court's attention that it was asserting that it was first in line for Debtors' assets because of its secured interest.  No one disagreed that Worldwide had a first lien.  The only question was the nature and extent of its interest and therefore the amount of its first secured claim.  Lenders have agreed that the Class B interest is valid and entitled to payment as a first lien position in the amount of approximately $1.8 million.  It is the Class A Claim that Lenders contest.  Worldwide asserts that the value of its Class A Claim, based upon Debtors' obligations to their vendors, is $5.7

million.   Lenders argue that the Class A Claim is an indirect obligation as a right of

subrogation and therefore not secured by the 2002 Security Agreement.  Worldwide counters

that Debtors obligation to Worldwide is a direct right of a surety.

Lenders contend that the 2002 Security Agreement supercedes the three earlier

security agreements and that the 2002 Security Agreement is materially different than prior

security agreements.  In particular, Lenders claim that the 2002 Security Agreement excludes

the Class A debt.  Debtors strenuously disagree, and rely upon the term "indebtedness" in the

2002 Security Agreement in its broadest sense.  The Court agrees that by securing "the

payment and performance of all of Debtor's obligations and indebtedness . . . regardless of

the form . . ."  Worldwide secured the Class A debt.

Lenders further contend that because the Class A Claims are contingent, Section

502(e)(1)(B) mandates disallowance of Worldwide's claim for any Class A obligations which

Worldwide has not paid.  Section 502(e)(1)(B) provides:

> (e)
> (1). . .the court shall disallow any claim for reimbursement
> or contribution of an entity that  is liable with the debtor on or
> has secured the claim of a creditor, to the extent that—
> *   *   *
> (B)   such claim for reimbursement or contribution is
> contingent as of the time of allowance or disallowance of such
> claim for reimbursement or contribution;. . . .

Worldwide directs the Court to Section 506(d)(1) which provides:

> (d)  To the extent that a lien secures a claim against the
> debtor that is not an allowed secured claim, such lien is void,
> unless —

(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of claim under section 501 of this title.

The Lenders reliance on Section 502 (e)(1)(B) is unavailing and soundly rebuffed in *Potter v. CNA Ins. Cos.* (*In re MEI Diversified, Inc.*), 106 F.3d 829, 831 (8th Cir. 1997), wherein the court, relying on legislative history, clearly and soundly held:

> The Trust Administrator's theory is completely divorced from the purpose of § 502(e)(1)(B), which is to "prevent [ ] competition between a creditor and his guarantor for the limited proceeds in the estate." H.R.Rep. No. 95-595, at 355 (1977), *reprinted* in 1978 U.S.C.C.A.N. 5963, 6310. Although the statute is not limited to claims by guarantors and sureties, its focus is on claims by those who *may* become liable to a third party because the debtor fails to satisfy a primary liability to that third party. *See In re Dant & Russell, Inc.*, 951 F.2d 246, 248-49 (9th Cir. 1991); 3 COLLIER ON BANKRUPTCY ¶ 502.05 (1996). As the court explained in *In re Hemingway Transp., Inc.*, 993 F.2d 915, 923 (1st Cir. 1993), *cert. denied*, 510 U.S. 914, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993):

>> The sole purpose served by section 502(e)(1)(B) is to preclude redundant recoveries on identical claims against insolvent estates in violation of the fundamental Code policy fostering equitable distribution among all creditors of the same class.

> Because this case does not involve competing claims or redundant recoveries, it is not surprising that the Trust Administrator's theory fails to fit within the literal language of § 502(e)(1)(B).

*    *    *

11

Here, Worldwide is not competing with creditors. Instead, Worldwide as the secured guarantor is trying to use its collateral to pay creditors. Thus, Section 502(e)(1)(B) does not negate Worldwide's secured claim. The master fact remains that Worldwide is not only a surety, it also holds a security interest.

Ultimately, the "contingent" nature of Worldwide's claim is the result of factors beyond its control. The Lenders pressed for an early hearing which did not permit Worldwide to ascertain fully the extent of the Debtors' obligations to the Class A Vendors. Similarly, without recovering from Debtors on its secured claim, Worldwide does not have money to pay the Class A Vendors. The timing and financial handicap do not, however, change Worldwide's secured status.

Worldwide points to the applicability of *In re Sabratek Corp.*, 257 BR. 732, 735 (Bankr. D. Del. 2000), wherein the Court found that the issuer of a letter of credit has a secured claim and takes a first-priority security interest in an obligor's assets before extending credit. *Sabratek* establishes that the secured claim arises when the issuer posts the letter of credit —regardless of whether there is a draw on the letter of credit. Similarly, Worldwide has a present valid secured claim, regardless of whether Debtors defaulted.

### The Amount of Worldwide's Secured Claim

The foregoing analysis establishes that Worldwide's secured claim extends to the potential claims of Class A Vendors. The difficulty for the Court is accurately determining that amount. The amount Worldwide claims it is obligated to pay Class A Vendors is

12

$5,709,657.00, an amount which Lenders vigorously dispute.

The trial in this case took place just over four months ago—time enough for Worldwide to have determined its exposure as a secured surety, negotiate with Class A Vendors and arrive at or near a more definite amount of its surety obligations. At this late date, the Court should not have to decide a disputed dollar amount which should be readily ascertainable based upon facts rather than possibility. Accordingly, the accompanying Order will schedule the additional submissions to the Court fixing the amount of Worldwide's claim.

## V.  CONCLUSION

The Court has found that Worldwide has a first secured lien on Debtors' assets with which to satisfy Debtors' Class A Vendors. The parties disputed the amount of that claim at a hearing the Court held four months ago. The intervening time has been sufficient to enable Worldwide to determine with precision the amount of its obligations to Class A Vendors  and provide the Court with a precise dollar amount which its secured interest entitles it to receive from Debtors' estate. In addition, the Debtors and Worldwide will have to agree upon a mechanism to identify Class A Vendors who have submitted a proof of claim in order to prevent duplicative payments.

The Court will issue an Order giving effect to the rulings herein.

Dated: October 30, 2009

Kevin Gross, U.S.B.J.

13